Yes, Your Honor, Mr. Beledock, representing the plaintiffs today. May it please the Court. The Court today is here to consider the issues concerning the interpretation of a consent decree and the defendant's compliance, as well as the Court's decision to vacate the consent decree. There are many issues presented in this case. Let me begin by stating that we believe that the Court failed to properly apply the relevant case law regarding interpretation of consent decrees. We believe that he failed to construe the court plan and the consent decrees in the context of the entire plan. And that holding was litigated and decided by this Court in J.F.D., the third decision of this Court in J.F.D., as well as has been reaffirmed in many other cases with regard to what a court is supposed to do when looking at a consent decree. The Court's not supposed to replace unambiguous language based on the defendant's contrary understanding. That was the Asarco case. The Court failed to look at the vast majority of the court plan, which included the 50 recommendations, which the 1998 compliance agreement, which was upheld by this Court, said had to be implemented for compliance. But if I were to understand where the district court was going, you had the original – well, you had three different consent decrees, actually, were reincarnations of the original. And the court looks at 50 recommendations, and then there are 250-some action items that flow from these recommendations. And the court's going through it and, over time, said, well, you know, a couple hundred of these action items have actually been taken care of. They've been done. And now we're getting down to the last group of them. Can't the court rely on the background that it has in that and say, look, if all the action items were actually done – and I know you're contesting that – but if all – if the court said every single action item that came out of these recommendations has been taken care of adequately, substantial compliance, wouldn't it be ready to then end the decree? I mean – Your Honor, but that was not the original intent of the parties. It says right in the court plan that they were called priority action items. They were the things that the defendants admitted in the plan were existing and were going to be done. They drafted this for purposes of complying with the recommendations. That plan was very detailed. It had introductory stuff. It had what they would call background for implementation. How could the court not look at the background for the implementation? How could the court ignore something that's right after each one of these action items has desired result? It was never intended, and in fact, the record supports the fact that those initial priority action items were the only thing that had to be done. In fact, if you compare the initial order plan, and there are – there were action items that were not included. There were action items after – inserted by the defendants after the joint report to the court. I believe that was in March of 2002, was submitted, which dealt with recommendations, only recommendations, and not – and not just the action items. If you look at the seven progress reports, you can see that we were never dealing with just action items. I think the court – that the action items weren't really intended to chart the – They were intended not to be the – Compliance. The end of compliance only. No. They were there to guide the initial two years. The plan specifically says it's a fluid process, specifically says we're going to meet later, specifically says we have to build infrastructure, specifically says we need other things like targets of capacity before we get to the end. There was no final date. So, no, I don't think, and I think the evidence is very clear, the only evidence in the record of the party's intent came by way of a defendant, Defendant Rankey. He testified when – and his department participated in this plan, developing it, that it was the intent for compliance to include recommendations, the backgrounds, and the desired result. That is the only testimony. Of course, the plaintiffs don't have any testimony because the plaintiffs are not there. It's – the defendants are there. And it comes right out of the defendant's mouth about what the intent was. How – how – I don't – You're telling me exactly what you're relying on in, for example, the document. I mean, which document should we be looking at, first of all? We should be looking at the document that's called Implementation Plan. Is that what we're looking at? Well, that's where the action items are. But I think – I think that the consent decrees are also relevant. And the court, this court – I know. But I want to know, you're making representations about the limited nature of the action items, and I want to know where I could find that. In the – in the initial part, I believe it's either the defendant's forward or the overview before the recommendations start. The testimony is obviously in the transcript. That's what I'm talking about, in the plan. I'll distinguish between the consent decrees and the plan. The action items are in the plan also. Right. Tell me where in the plan I should be looking. It's in the first few pages, Your Honor. I don't have that one document with me so I can tell you, but I – I'm almost positive it's there. I cited it in my brief where exactly it is in the record. I can assure you of that, Your Honor. And I – so I think when you – and as the court said, when you look through them, the recommendations and the action items, they can't be taken out of context. I mean, that's what Jeff D. 3 says. You can't take something out of context. You can't change something that wasn't the party's intent. The Supreme Court clearly has – has said you can't – defendants cannot rewrite a consent decree. They can't – they can't relitigate it either. And so I think the court clearly erred in that respect. I think the court also clearly erred in terms of making the plaintiffs prove, by clear and convincing evidence, that the defendant's interpretation was unreasonable and didn't consider the other inherent enforcement mechanisms available to it that have been completely recognized. We were entitled to compliance and enforcement of that – those decrees and court plan. We didn't have to prove by clear and convincing evidence that the defendant's interpretation was unreasonable. The language is what was – what was required. The language in the plans were what was – should have been enforced. And the court repeatedly made findings. We didn't need our burden of proof. We made no findings that they were in compliance. I do remember some of the action items. The court said, well, there hasn't – the plaintiffs have failed to make out their clear and convincing level of proof. But how many of those were there? About four? Oh, no, Your Honor. There were 17 action items where the court said the plaintiffs didn't meet the burden of proof or contempt. And the defendants – and seven of these out of the 17 where it made no findings that the defendants were in compliance. So they're a large number. Okay. You know, and remember, a lot of these action items, they're all interrelated. There's a lot under each of the 50 recommendations. No, and I've already – and I've already got your point that the action item shouldn't be the full measure of compliance. Thank you, Your Honor. As far as the contempt standard goes, did you ask for that standard or how did that come about? We never asked for that standard. That's what the court applied right out of the transcript when we began the compliance hearing. It said this is what I'm going to do. This is how I'm going to consider it. I did not file a motion for contempt with regard to this. Did you object to the standard when the court announced it or did you have a chance to? We – I think in the summary judgment, when they argued that, we opposed that, Your Honor. I can't remember if we did that. But he had – the court had indicated even before that. And as you see the transcript, he says, I just want to make clear again. And so, no, I don't – I don't remember, to tell you the truth. But we had clearly in the record opposed that. What do you mean by you didn't move for contempt? You moved for enforcement. Is that what you mean? Yes, Your Honor. Yes, Your Honor. We moved for enforcement. But essentially, I mean, the way things are structured, usually if you're moving for – unless you're moving for a clarification or modification of the decree, which I don't know whether you can do that with a consent decree. But if you're moving – can you? I mean, could you ask for a further clarification when what you have is a consent decree? Well, you can move the modified under 60d-5, certainly, Your Honor, if there's something that changed or requires that. But – but – Well, if that's true, then, you know, for some reason, nobody has discussed the Horn case in the Supreme Court a year ago, as to which I have some intimate knowledge. And I wonder why. I mean, if it's applicable, don't we really have to go through a set of inquiries, which I must admit you're not fully understanding, but seem to be something very vague and general as to whether this is still equitable? And is your complaint that he didn't do it that way? Is that your problem? Well, Your Honor, to answer your question why Horn is not addressed is because the briefs were filed before Horn came down. And I understand that, but I have a prejudice. I will certainly address that. And I think that is – really gets to the crux of what this Court has to do today. Horn determined two things. It said you – and Horn's a lit – is different because it was a statute and the statute was, you know, was limited. It had a possible consent decree, and that's why I'm wondering if that matters. Yeah. No, but Horn said Rufo and Frew are still good law. In my view, it didn't change the law. It criticized the Court – five members – criticized the Court on how it applied the law. Either the standard was too strict or – and the inquiry too narrow. This case – look at this case. There's two things you've got to look at. What Horn says, it says the Court under 60B has to look at whether the objectives were achieved and whether there's a durable remedy. And I think that inquiry is the most crucial in this case. Were the objectives achieved? Absolutely not. The objectives are the 50 recommendations. The objectives – this Court has held that the objectives was community-based services for these children who suffer from serious emotional disturbance. So they don't have to be hospitalized. So they don't have to be institutionalized. So they don't have to be incarcerated to receive mental health services. That's the objective of this lawsuit. That's what those 50 recommendations and desirable result was supposed to achieve for 30 years. It didn't. The Court made no finding of that. In fact, the findings showed the exact opposite. The Court made no findings that there was a durable remedy. Matter of fact, the Court ignored Frew, which says Federal courts can enforce consent decrees. They don't have to hope for compliance. The Supreme Court used hope. So what does the Court do? He vacates the entire consent decree after – like, first he finds they're totally compliant. Then he vacates it. He doesn't even look to see if there's a durable remedy. And the evidence is right before him that it's not only not durable, but they haven't done it. They haven't done what they said they were going to do. And how would enforcement have been except by contempt? Well, Your Honor, what we had tried to argue was that the Court should appoint a special master. And the Court actually granted that motion, but then abandoned it and went to this hearing. And that's what we suggested. Get a special master to determine where we are in compliance and how we need to be in compliance. Your Honor, you know, I think if you want to look at very few exhibits really sum up how this whole case, what – why the Court erred and how it interpreted the decree and how – and that it erred in granting that motion. If you look at the charts, which start on page 350 – well, 357, and go to 361, and you look, these charts, the defendants have objected to these charts. Look at the docket sheet. They submitted them. They admitted them. You look at what it says on these charts for therapeutic foster care. It's all there. The needs assessment, which is the 50 recommendations and the recommendations for therapeutic foster care, that's to keep kids out of institutions, out of hospitals. The needs assessment said you've got to have a capacity of 674 on a statewide level. They admit they only meet 18 percent. Some of those regions only have 3 percent. They have – most regions don't even have 10 foster beds in the whole region. Okay? You go to day treatment, they say they meet 51 percent of the target of 599 that they in 2006, 306. And you go through that, all of them are less than 50 percent. All of the community-based services are less than 50 percent. And recommendation 22 and all the action items talk about you've got to get more money. You've got to get dedicated GFD funds. And those funds go to community-based services, not hospitals, not tens of millions for incarceration, not 16 million for residential and inpatient care. You know when they meet the targets? They meet them for inpatient care. What's inpatient care? That's hospitals. Some – they meet them by 222 percent. Two regions are between 275 and 285 percent. Dr. Bruns testified of the harmful – and this court has recognized the harmful consequences of putting those kids into – causing them to have crisis by not delivering the services, putting them in residential care, putting them in hospitals. Why? Because they don't get community-based services. You don't have to take my word for it. Their expert said that. Their expert wrote a report to the ICCMH that said in 2002, November 2002, you're not providing community-based services because there's a lack of funds. And what he said was that kids are being dumped, dumped into juvenile justice because they're not getting services. I think if you want to save any time for rebuttal, maybe we better let the other side speak. Thank you, Your Honor. Thank you, Your Honor. May it please the Court, my name is Michael Gilmore. I will be representing the Director Ranky of the Department of Juvenile Corrections, and I will be addressing some issues common to all the defendants. In the last eight minutes, Mr. Carlson will address issues unique to the Department of Juvenile Corrections. You'll keep track of your division of time, please. I'd like to begin by discussing the action items. When the district court received the recommendations in 1999 and 2000, it found that in its essence they were a sketch and not a blueprint. So what the district court ordered the parties to do was to come up with an action plan to, quote, provide a comprehensive blueprint on how the defendants could meet the requirements of the decrees. And the purpose of the action plan and the action items which it contained were to provide measurable, definable, and demonstrable benchmarks to judge compliance. When it came time for the court to try this case six years later in 2006, the court said the action items are the best indicator of the party's intent and the best indicator of whether a particular subject of negotiation is embodied in the consent decrees of the filings and documents available to the court. They are clearly the most specific and difficult to identify. All right. So I was trying to get Mr. Belotov to tell me where in the implementation plan there's a description of what the concept of the action items was, and he couldn't, but this is what I can find so far. There's a paragraph called Oversight Process. And in it, it does say several times that you're talking about the plans, action items for the first two years. And then later it says the next two years will allow the development of the ability to size service capacities and needs, et cetera, et cetera. With the data collected to size and identify gaps in the service system, the parties will set about reviewing the plan with the goal of revising and setting new actions for future expansion of the core services with the primary service expansion taking place in the following years. It will be necessary to revisit the plan and to further develop the actions and goals based on the learning of the first two years. Continuing planning is realistic if we are to achieve a successful, integrated system of care for children with SED and their families. A final date for completion has not yet been set. So why doesn't that very much support the plaintiff's understanding of what this was? Because what the court or what you were just reading, Your Honor, was a description of where action kept coming in there over and over. So the action items are implicit. I will concede that the district court in 2000 never once said, I will measure compliance by action items. But over and over again the court said, I need an action plan. I need an action plan. I understand that, but I'm asking you whether the plan that was actually produced, as this description seems to say, was consciously and meant by the parties to be a preliminary one. And then each of the action items is headed priority action items and timelines. The timelines are all in 2001 and pretty much maybe 2002, but not beyond there. And so that seems to back up the notion again that this was about the first two years. The action items did mutate a bit over time. And the parties, for the next four years, the parties operated off the action items. They were periodic. But because they weren't done in the first two years, so they were still on the table. But as to what this was meant to be, it seems fairly lucidly clear that it was not meant to be the end of the story. It was meant to be the beginning of the story. The parties eventually settled on the action item. Excuse me. The court eventually settled, as the case evolves after periodic meetings, by deciding that the – well, let me back up a little bit. As I understand the Hickson case, which came out last year, that the issue is whether the court abused its discretion in how we interpreted this contract. This is a contract under right of a law. There are no federal, statutory, or constitutional rights involved in this plan at this point. The court decided that substantial compliance with this contract was best measured by the action items. The court that was intimately familiar with it. I'm asking why was that reasonable in light of what the parties said about what the action items was? Because the court was involved in formulating the plan. The court ordered the plan. The court resolved differences in competing action items that were submitted to the court. The court, more than anyone else, knew what the overall agreement was because the court was part of the agreement. But that says in the agreement what the overall agreement was, and I just read it to you. So you have to account for that. The overall agreement was to create a system never been created before, a system providing services to children with SED before they got – in the community. And the judge, based upon his familiarity with this case for years and years, based upon a two-week trial, based upon 141 findings of compliance with action items in this findings of fact and conclusions of law after a two-week trial, found that there was substantial compliance under Idaho contract. With the action items, but the question is what were the action items? The action items were the court's best judgment of what was a measurable, demonstrable, and definite way of finding compliance. Let's put it another way. It was a one – it seems to me it was a one-way ratchet. If they hadn't complied with the action items, and I want to get to that in a minute, then they certainly weren't in compliance. But if they did comply with the action items, there's no indication from what this document says the action items were that they were in compliance. The court is entitled to interpret the entirety of the agreement. And the court – the court's interpretation of this contract under Idaho law is entitled to deference. How long had – how long had General Widnall had this case? He was appointed to the bench, I believe, in 95 or 96, and he took the case when he was appointed. And the judge who had it originally retired? Yes, that's correct. What about the question of the standard that was applied? Is it your understanding that he applied to the motion to vacate the same standard that he applied to the contempt order or not? No, Your Honor. The contempt analysis. No, Your Honor. When we got the findings of fact and conclusions of law from the hearing that was held in 2006, actually they ran on two tracks. There were 141 instances of finding substantial compliance with the action items, nine instances of finding no substantial compliance, and 34 instances of what Mr. Beledoff described as the contempt standard. Plaintiffs failed to present clear and convincing evidence. I did a computer search in my preparation of those 34 instances where the contempt standard was applied – excuse me, where the contempt standard was discussed. Seventeen of those were followed by a finding for the individual defendant involved in that action item that the individual defendant had complied. And let me explain why. Some of the action items involved non-defendants. And so when non-defendants were involved, Judge Windmill uniformly used this, what I will call the contempt boilerplate, rather than repeat it a second time. Some of the action items involved, for example, local school districts or the State Department of Education who are not defendants. And so in those instances, Judge Windmill applied the contempt standard and said the plaintiffs had not met the burden. But in 17 – Well, it appears that – you appear to be in agreement, because you're now saying there were 17 and he said there were 17. So let's take the 17. The 17 involved action items that did not name any of the defendants. They would have been non-defendant persons, the State Department of Education or school districts, people that the defendants did not direct. That's 17. But what about the other 17? Those are the 17 I'm just describing. The 17 for which there was no finding that the defendants were in substantial compliance did not name the defendants. They named other non-defendant parties, like school districts or the State Department of Education. I'm confused. You said there were 34, of which 17 were of that character. What about the other 17? Okay. Let me start over. I guess I'm not being clear. There were 34 instances of the contempt boilerplate. Of which 17 didn't name. In 17 of those, the next sentence says, however, the named defendant is in substantial compliance. Of the remaining 17, the named defendant was not involved in the action item, because the action item was directed to somebody like the State Department of Education, who is not a defendant, to local school districts, or to the ICCMH, which was the multi-member body. But that's another. That's a dispute between the two as to whether they're covered, right? Yes. So of the 17 for which there was no finding of the defendant being in substantial compliance, the action item was not directed to the named defendant. It was directed to other persons. So what happened then after that? Can the State divide itself up like this? I mean, my understanding is the ICCMH was formed by the relevant State parties to get to implement this. And now you're saying, but what they do is not our problem. The ICCMH had non-State parties involved in it. It was an advisory group. And the State can divide this up because of Will v. Michigan. The only real defendants here are individual officers. Those are the only ones who can be held in contempt. Now, this case is so old, it was styled in a manner that they're the only ones who are going to be held in contempt. They're not, it seems to me, the relevant people necessarily for vacating the decree, in the sense that this organization was established by the parties who were sued to implement the decree, and if they're not doing it, why isn't the actual defendants responsible for that in terms of vacating the decree as opposed to in contempt? I mean, you can't put people in jail who weren't in fact the defendants, but that's a different problem. The judge, Judge Windmill, vacated the decree because it found that the individual defendants who are subject to the decree hadn't reached substantial compliance. There are persons mentioned in individual action items over whom Judge Windmill had no authority over. But I'm talking in particular about this ICCMH group. Yes. Which was, as I understand it, formed by the defendants, at least in part by the defendants, in order to get Yes, the ICCMH was formed by a gubernatorial order, but it was not subject to gubernatorial authority. It had non-state actors on it. It could act independently of the governor or the director of the Department of Health and Welfare. And so the defendants, even though they set this up to implement the decree, had no responsibility for what it did? They had responsibility for their actions on the ICCMH, but they could not, because they were not a majority of the ICCMH, they could not dictate what it did. With the Court's permission, I would turn the remainder of my time over to Mr. Carlson. All right. Unless there are further questions for me. I don't know which one of you might want to address this question, but I'm interested to know whether it's reasonable to vacate the decree because the contempt standard wasn't met in showing no substantial compliance. Your Honor, if I could address that. If you look at Judge Windmill's order of vacation, it has two sections. The first deals with whether the noncompliant items have been complied with, and then it switches to the RUFO standard for vacating the decree. In the second section of the opinion, it talks about RUFO. It talks about that line of cases. It does not refer to the contempt standard at all in the section on vacating the decree. Okay. Thank you. May it please the Court, good morning. James Carlson. Good morning, Your Honor. Representing the Department of Health and Welfare and Carl Kurtz, who is then the Director. I'd like to begin with answering a few of your questions. The questions intimated that Judge Windmill was intimately involved with this case, that's an understatement. As you can see by the trial transcript and his orders, he's speaking to you. He's not an advocate. He's telling you in this record that he is interested in this, he's committed to it, and he's been dealing with it for 15 years. And part by part, he examined this program to see how it was built. Mr. Gilmour told you this is something that's never been built before, not anywhere, not by any governmental entity in a partnership with community action people like ICCMH. No one knew how it was going to turn out. But like building a house, you had to have a blueprint. You had to specify what were the materials going to be, what type of design of roof, et cetera. Otherwise, the builders don't know how to build the house, and no one knew what it was going to look like, and that was everybody's agreement. We will build this, and if our designs are appropriate, it's going to be successful. Well, Judge Windmill examined it, and he found that the department built this program per the design specifications, the measurable objective specifications. I understand that. But to go back to my why, it appears, unless you can tell me why not, that the document itself does not, did not set up these action items as the ultimate standard but only as the preliminary standard. That is, that these were what was supposed to happen at the beginning, not what was supposed to happen at the end. Now, if I'm wrong about that, you need to tell me why I'm wrong about it. Your Honor, I'll say you're partly wrong about it, with all deference. I'm looking at the record, and I believe I found it for the rest of the Court. It's the Appellant's Excerpt of the Record, page 168 is where I'm reading. It begins at 165. But I'm reading at it. There's a paragraph on page 168. Within the limited resources available, the defendants must seek to balance these needs and expend resources available on both ends. The building of service capacity will necessarily take time. The near-term goal should be set realistically on existing capacity. So this is an expanding program. It's not an end in itself. But Judge will know after doing one for 16 years. Just a minute. The next sentence says, this is reflected in the actions for the first two years in developing the necessary infrastructure in order to be able to accurately size the system while the existing service capacity is being built upon with the ultimate goal of a comprehensive system of care. I mean, the more one reads this, the more it's perfectly plain, I think, that these action items were meant for the first two years. And a final date for completion has not yet been set. Well, I can answer that, Your Honor, by telling you that on this side of the table with Mr. Beledoff, he didn't think so because we submitted these plans to the court for approval. And that's what we measured at the compliance hearing. Yes, because, again, it was a one-way ratchet. If you were in compliance with them, then you were not in compliance. But the opposite is not true. Your Honor, this system has been built. This system, it will never be finished. Under your theory, Your Honor, I think you'd have a consent decree last forever. I don't think so. I think that the scheme here seemed to be that for two years you were going to do this, and then you were going to come up with some more action items. If the system ñ the action item is the blueprint. And once you've completed the building for the blueprints, used those materials and those resources, this building has been finished. And it's up to the state officials, I believe, Your Honor, to utilize their insights and their solutions to continue with the system. And that's where we are. There is no governmental program, be it the courts, be it the police, be it a hospital, that is absolutely perfect. It is continuing on. At this juncture, I think, Your Honor, Judge Windmill found that this program is up and running and doing very well. As the author of the needs assessment said, Your Honor, if they were able to do 20, maybe even 30 of these action items, that would be tremendous progress. Judge Windmill found that it wasn't equitable to keep paying the attorneys' fees and keep monitoring this case when, in fact, the state was committed and had designed this system, and it was up and operating, and it was succeeding. Well, I mean, that, after Horn ñ and I don't know if you want to comment on Horn, but it seems to me that Horn ñ I'm not ñ I don't really know whether Horn, that portion of 6b-5 applies to consent decrees. But assuming it does, that you could have, I suppose, asked for modifications similar to what happened in Horn. But that isn't what you did. What you asked for was a determination of vacating the entire decree on the ground that it had been satisfied. So that you had to show substantial compliance, right? Yes. That, in fact, the decree, the objects of the decree had been met, and that the facts indicate that it was no longer equitable for a federal court. This case began 20, what, 30 years ago, when juveniles were housed with adults in a hospital. And it has morphed into a system that has controlled the action of six governors, I don't know, 20 sessions of the legislature, involved multiple millions of dollars, a complete change in the system. And Judge Windmill found, you know, after dealing with this for 15 years, the system is up and operating. And he cites the numbers, the numbers on this chart, Your Honor, that Mr. Beladoff talks about. Those are those long-term theoretical targets where you take 7%, 8% of all people, and those people are going to be SED, and then you multiply them out throughout the whole system. Well, in two years, excuse me, since 1992, those same measures that Mr. Beladoff talks about, outpatient treatment, community-based treatment, has tripled. Therapeutic foster care has doubled. Day treatment almost doubled. This is a tremendous progress. You can imagine the inertia in the entire state governmental system, with all its employees and procedures, a complete revamp. Well, you know, the thing that strikes me, and I suppose strikes anybody who comes to this for the first time, it's taken 30 years. The only other historical event that I know of that took 30 years is the 30 Years' War. And I didn't suppose this was a war. Why has it taken 30 years for the state to get into compliance? It doesn't seem to me a wonderful accomplishment to do it in 30 years. No, it, I imagine it was a war at times. This was 30 years ago. Consent decrees were fairly rare in a state like Idaho. You say this was like a war? I believe it was. You know, we had a change in administration, and the state government said, hey, the only way the federal court's going to go away from this is if we meet the object of this decree. Let's get going. And there was a sea change in approach. What, 15 years ago? No, I'd say in about 2000 it started. And that's where my familiarity brings. And that's why we were interested in bringing this in front of Judge Windmill, who was part of the architect of this plan. This is as much Judge Windmill's as it is plaintiff's as it is defendant. How do you solve this problem? I think it's significant that he found it was solved. Thank you. Do you, I think I know, but I'd like to hear how you respond to the argument, Mr. Belidoff, that there are regions where the outreach type of care is 3% or 7% of the target or something like that. Those are the numbers, and Mr. Belidoff will tell you, those are the numbers from 2001 to 2002. They've been steadily climbing, but they are low. And it's much like, I think it's like, and I've asked the officials this, they say it's like the flying swine flu program where all these vaccines are available, yet the public doesn't come and utilize them. They're available. The capacity is there. Yet it's a voluntary program, and they don't come in. They don't come in because of lack of awareness, that they're receiving services through a private physician, maybe through a church, that they're dealing with this in-house. But that was part of the program was to get this education to the public, and this ICCMH, that volunteer board that would be in these communities to, again, increase this capacity. But it does take time. It's much like if you would build and make a determination there wasn't enough courthouses, well, you'd build all the courthouses. Does that mean they're all going to be utilized in the first week, month, year, ten years? No, it's for over time you build the system. So, yeah, they didn't come forward in the big numbers that are anticipated, but they're going that direction, as Judge Windmill found, that it's that continuous progress. And that's the question. If you want to continue federal oversight of this program that's working and making progress, how do you ever reach the end? How do you ever determine when there's complete compliance? Thank you, Your Honor. Okay, thank you. I don't know if we've got a little time left. Thank you, Your Honor. I know I'm short on time, but I'm going to try to run through a lot of the questions as quick as I can. First of all, Your Honor, it's the Excerpt from Record 163 that I cited in my brief on page 21 and 22 with regard to the language you were quoting from on the action items. I would also note for the Court what counsel read was what they referred to as the defendant's forward, which plaintiffs objected to and the Court did not accept in its order accepting the plan. So that was the plan not to cooperate. This whole idea that they come and they say, Judge, we're going to set up this ICCMH. We're going to run it. We're going to fund it. We're going to do everything we can to organize it and adopt the procedures, but we're not responsible. We don't collaborate. They set it up to collaborate, but then they say they're not going to they can't do it because they can't collaborate. On the action items, yes, there was 17-1 on contempt, but the Court also found 17, it just seems like a common number by accident, where the Court found it wasn't going to hold the defendants liable as an individual defendant because they only acted as a member of the ICCMH. There's nothing in the plan that relieves them of their responsibility. That plan was in accordance with the Court's duty to and plaintiffs to allow the State flexibility. Tell us what you're going to do. I didn't write the plan. They did. Okay. I filed some arguments and objections in the record, you know, but the Court adopted it. But the judge is right. If you look at those dates, and I argued. When I went to the Court, I said, we've got to get on with this. I objected to the length of those dates because of what it said in there, that we're going to do something after this. And the Court accepted those dates, but clearly. Just a minute. What was the date of this document, the implementation plan? When was that? I think it was March 2001, Your Honor. But most of the things, most of the action items had to be done within the 2002 frame period. Of course, they weren't done. They still weren't done when the Court held the hearing in 2006. Did Judge Windmill ever respond to this argument that these action plans, these action items were really preliminary ones and not final ones? No, Your Honor, because he just accepted it. He adopted wholeheartedly the defendant's proposed findings. You won't find a reference to any of my exhibits where it starts with 1,000 numerically. You won't find a reference to any transcript of my witnesses. He adopted them almost wholeheartedly. Therefore, of course not. There is nothing in there. But haven't you been working with action? I mean, did you object? Did you want none of the action items? No, it wasn't that, Judge. It was that we wanted the recommendation implemented. That's what the consent decree required. That's what they agreed to. The judge can't go in there and rewrite the consent decree. Through the Supreme Court says you can't do that. You don't re-litigate the merits. Seriously, though, do you really think that we look at this and say Judge Windmill just tried to rewrite the consent decree? You don't think that he thought that by and large the consent decree's goals were being achieved? I don't think how he could make the conclusions when he had these in the record that after 30 years, day treatment was at 51 percent. And if you look at Excerpt of Red for 1586, which is, again, their document, day treatment, they provide $106 per student per year. Let me repeat that, per year. Jessica Dirch testified she had a program up and running with 54,000. They cut it in half, and all she could do then was crisis intervention for her day treatment. You can't run a day treatment. You can look at the numbers, but you can't run anything on $106 a year to be effective. If you look at Excerpt of Record 1370, which is, again, the defendant's put this before the court, and you look at the appropriation the legislature passed before the court ruled on the motion to vacate. Look at page 1374, which is part of the statement of purpose physical impact. You will see that the legislature knows. It says 945, Jeff D. funding. They gave additional 596.90. 947, additional funding, 350. Okay? An additional thing. If you look at this bill on page 1372, Section 9, you look to see what the legislature said. They added the new funds together, and they came up with $2.1 million. Judge Wendell found that under recommendation 22, let me just finish this thought, 22, they needed to give $8.4 million of dedicated Jeff D. funds. Dedicated. Not the funds they use to hospitalize, incarcerate. Dedicated. Day treatment. Respite care. Family support. Therapeutic foster care. That is the Jeff D. services. The legislature knows it. The court just took the total appropriation, didn't distinguish, and said, call it good. But now, here's the evidence. It's indisputable. It's right in this document. 2.1. They were ordered in 1990 to do that. They were ordered by the district judge, Judge Lodge, in 1990. Judge Wendell, you know, I think he summed it up in his order to vacate it. He hoped. He hoped that they would continue. Well, he had the evidence with these documents right before him. There was no hope. It's not a durable remedy. I think we have you. Can I ask my question? I know Judge Verzon had a question. I have one question, which is, I mean, I'm trying to focus on the legal question of whether this action document was meant to be the final blueprint or not. That seems to me perhaps wrongly to be the critical issue. If you look at Judge Wendell's opinion in 2000, maybe what the disconnect is, is that he ordered an action plan that would have been the final blueprint. I mean, what he said was that he wants an action plan to comply with the previous decrees and that the action plan shall include deadlines by which the intercorrect implementation of the final goal shall be met and shall set forth a process which the State shall demonstrate to the court that it has fulfilled the incremental goals and it should set forth a clear path and final dates for the implementation of the final goal, compliance with and ultimately the termination of the court's decree, and shall specify the final etc. So, I mean, it's maybe the problem here is that he ordered a certain thing and from your point of view what he got was not that thing? That could be, Your Honor. But it was very clear of what the defendants were proposing and submitted. And if you look at the Excerpt of Record 358, which is my arguments against that, I was addressing many of these issues, you know, in 2001, which are before the Court now, which didn't, because that plan. But he thinks that when he approved the action plan, that's what he approved, because that's what he ordered. So why isn't that the end of the story? I don't think, I don't know if he did, because if you look at the seven progress reports and if you look at the joint report, you see that the parties always intended it. It didn't focus in. As a matter of fact, sometimes it never even mentioned the action item specifically. It mentioned recommendations. These are their progress reports. Okay. I'm not sure we understand. I believe Judge Noonan had a question for you. This is a peripheral question, but I understand the respondent is a governor who's no longer there. Is that right? The name respondent. Judge, yes. Governor Ken Thorne is no longer governor, actually. It's Governor Otter. So we should change that. How about Jeff Dee? He must be in his 40s now. How is he the named plaintiff? You're right, Your Honor. The court has never required me to substitute the names because they were pseudonyms anyway, but there's no question there are thousands of these children out there, and I'd be happy to substitute if I was required, but that's never been asked of me to do that. So, I mean, you're totally in charge of the litigation because these people aren't capable of expressing their own. Well, Your Honor, in terms of, yes, these are mentally ill juvenile children, but, yes, I had several parents testify at the hearing on behalf of their children, yes. Okay. And then on the attorney's fees, Judge Wittenbaum reduced your fees. Are you appealing that? Well, Your Honor, I did not brief that issue because I felt the merits were more important, but if you overturn, I would certainly, if I have to, move for relief from judgment from that. But, you know, I'm here because after 30 years, these kids deserve it. Okay. I think we have your point. If there are no further questions, we'll order this case submitted for decision. That concludes our argument for today, and the court stands adjourned. All rise.
judges: Canby, Noonan, Berzon